******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ABELE TRACTOR AND EQUIPMENT COMPANY, INC.
*v.* SONO STONE AND GRAVEL, LLC, ET AL.
(AC 35118)

DiPentima, C. J., and Beach and Keller, Js.

*Argued February 6—officially released July 8, 2014*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Hon. Alfred J. Jennings, Jr., judge

trial referee.)

*David Eric Ross*, for the appellants (defendants).

*Joseph P. Sargent*, for the appellee (plaintiff).

*Opinion*

KELLER, J. The plaintiff, Abele Tractor & Equipment Co., Inc., brought the underlying action sounding in breach of contract against the defendants, Sono Stone & Gravel, LLC (Sono), and Donald R. MacIntyre. The defendants appeal from the judgment of the trial court, in favor of the plaintiff, rendered following the court's acceptance of a report filed by an attorney trial referee.[1] The defendants claim that the court (1) lacked jurisdiction to accept or render judgment on the report because, in derogation of Practice Book § 19-4, the attorney trial referee filed the report more than 120 days following the completion of the trial; and (2) accepted the report in error because the agreements on which the attorney trial referee based his report were not enforceable. We affirm the judgment of the trial court.

By way of its revised complaint, the plaintiff alleged that, at times relevant, it was "in the business of renting construction equipment and providing related materials and services for construction projects." The plaintiff alleged that on or about November 28, 1998, Sono entered into a written agreement with it whereby "Sono agreed to purchase parts, services and equipment . . . from [the plaintiff in] exchange for the payment of funds," and that "Sono also rented equipment from [the plaintiff] pursuant to written rental agreements . . . ." The plaintiff alleged that Sono failed to pay principal and interest owed to it pursuant to these agreements. As of December 21, 2005, the plaintiff calculated this amount to be $59,120.21. The plaintiff alleged that MacIntyre is a principal of Sono, and that he agreed in writing to "be personally, absolutely and unconditionally bound for all obligations owed by Sono to [the plaintiff]." The plaintiff sought damages from MacIntyre for the unpaid obligations owed to it by Sono.

In their answer, the defendants admitted that Sono entered into "an agreement" with the plaintiff, but denied liability "to the extent claimed by the plaintiff." The defendants denied that MacIntyre was liable for moneys owed by Sono. By way of special defenses, the defendants claimed that (1) insofar as the plaintiff sold defective equipment to Sono, it materially breached the agreement on which it relied; (2) because of representations made to the defendants, the plaintiff was equitably or promissorily estopped from seeking to recover the extent of damages that it sought; and (3) due to the defective equipment provided by the plaintiff, the defendants suffered damages and, therefore, claimed "set-off/recoupment against any amounts claimed by the plaintiff." The plaintiff denied the allegations contained in the special defenses.

The matter proceeded to trial before an attorney trial referee, who filed a report in the Superior Court for the judicial district of Stamford-Norwalk on April 28,

2011. In the report, the attorney trial referee made a number of detailed findings of fact and concluded: (1) that Sono had failed to pay the plaintiff $26,624.26 in invoice charges for equipment rentals and repairs; (2) that beginning on December 15, 2000, the plaintiff equitably was entitled to interest at the rate of 1.33 percent per month on charges outstanding as of November 3, 2000; (3) that ten days after the dates of the invoices, the plaintiff was entitled to interest at the rate of 1.33 percent per month on unpaid invoices that were submitted to Sono after November 3, 2000; (4) that the plaintiff was entitled to attorney's fees in an amount to be determined;[2] (5) that pursuant to a guarantee MacIntyre had executed, he was liable for all amounts that Sono owed the plaintiff; and (6) that the defendants failed to prove any of their special defenses.

Thereafter, the court considered a motion to accept the report and to render judgment in accordance with it. By written objection, the defendants claimed (1) that the court lacked jurisdiction because, in derogation of Practice Book § 19-4, the attorney trial referee filed the report more than 120 days after the completion of the trial; and (2) the attorney trial referee relied on a credit account agreement as well as "rental lease" and "delivery ticket" agreements that were not enforceable against the defendants.

The court considered the objection related to the timeliness of the decision of the attorney trial referee before taking any action with regard to the objection related to the enforceability of the agreements on which the attorney trial referee had relied. On September 26, 2011, the court heard argument with regard to the alleged violation of Practice Book § 19-4. On October 20, 2011, the court issued a thorough memorandum of decision in which it overruled that objection.

Thereafter, on April 24, 2012, the court heard argument concerning the defendants' objection related to the enforceability of the agreements on which the attorney trial referee had relied, as well as a supplemental objection raised by the defendants related to the attorney trial referee's award of interest. On August 30, 2012, the court issued a memorandum of decision in which it overruled those objections and granted the motion to accept the report of the attorney trial referee. The court rendered judgment in favor of the plaintiff as against both defendants in the amount of $26,624.26, and awarded interest as set forth in the report. The court awarded the plaintiff reasonable attorney's fees and costs of collection, but noted that it would hold a hearing to determine both the amount of interest and attorney's fees to award. The court denied the defendants' motion to reargue or to reconsider its decision. This appeal followed.[3] Additional facts will be set forth as necessary.

I

First, the defendants claim that the court lacked jurisdiction to accept or render judgment on the report because, in derogation of Practice Book § 19-4, the attorney trial referee filed the report more than 120 days following the completion of the trial. We disagree.

At the outset, we observe that Practice Book § 19-4 provides in relevant part: "An attorney trial referee . . . to whom a case has been referred shall file a report with the clerk of the court . . . within one hundred and twenty days of the completion of the trial before such referee . . . ."[4] A trial court lacks the power to accept a report of an attorney trial referee that does not comply with Practice Book § 19-4. See *Ficara* v. *O'Connor*, 45 Conn. App. 626, 630, 697 A.2d 696 (1997) (reversing judgment of trial court after it accepted report of attorney trial referee that did not comply with earlier version of Practice Book § 19-4); *Gumpert* v. *Ore-Ida Foods, Inc.*, 39 Conn. App. 635, 636, 666 A.2d 437 (1995) (same). Before both the trial court and this court, the parties have addressed this issue, in part, as involving the jurisdiction of the trial court, and the trial court couched this issue as implicating its "subject matter" jurisdiction. The issue, however, is not jurisdictional. Rather, it concerns the court's *power* to accept and to render judgment on the report. Practice Book § 19-4 is not a legislative enactment; it is a rule of procedure promulgated by the judges of the Superior Court. It is fundamental that, generally, the legislature establishes the jurisdiction of the Superior Court. See *Piquet* v. *Chester*, 306 Conn. 173, 188 n.14, 49 A.3d 977 (2012). Article fifth, § 1, of the constitution of Connecticut, as amended by article twenty, § 1, of the amendments, provides: "The judicial power of the state shall be vested in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law." Practice Book § 19-4 is seemingly analogous to General Statutes § 51-183b, which, in civil causes, establishes a 120 day limit for judges and state trial referees to render judgment following the completion date of trials. Yet, § 51-183b, which has been held to implicate personal jurisdiction; *Waterman* v. *United Caribbean, Inc.*, 215 Conn. 688, 691–92, 577 A.2d 1047 (1990); does not apply to attorney trial referees, who lack the power to render judgments. See, e.g., *Gumpert* v. *Ore-Ida Foods, Inc.*, supra, 640.

Having framed the issue before us as one involving the court's power to accept and render judgment on the report, we turn to the merits of the issue. In overruling the defendants' objection, the court found in relevant part as follows: "The [attorney trial referee] heard evidence on February 23, February 24, May 28, and June 17, 2010. Posthearing briefs were filed by each party on October 8, 2010. There was a supplemental/corrective

filing of a brief by the plaintiff on December 30, 2010. On April 28, 2011, the [attorney trial referee] filed his ten page report of attorney trial referee . . . incorporating forty-four specific findings of fact and six 'ultimate facts/conclusions.' " (Citation omitted.)

Discussing the posttrial factual record, the court made the following findings: "The [attorney trial referee] convened a posttrial hearing with counsel on October 27, 2010. The transcript of that hearing has been filed. . . . The very legitimate purpose of the hearing was for the [attorney trial referee] to put on the record a possible conflict of interest due to a federal lawsuit that had recently been filed by . . . counsel for the plaintiff in this case, on behalf of another client against an official of the city of Stamford. (The [attorney trial referee], Kenneth B. Povodator, is and was then an assistant corporation counsel of the city of Stamford, who would have at least tangential involvement in the federal lawsuit.) There was a full disclosure of the federal lawsuit and the [attorney trial referee's] potential involvement therein . . . . [The defendants' attorney], who had been made aware of the details of the federal action by [the plaintiff's attorney], waived on behalf of the defendants any actual or perceived conflict of interest and agreed that the [attorney trial referee] could proceed to decide the case. . . . [The plaintiff's attorney] expressed the opinion that he personally had no objection to the [attorney trial referee] staying on the case . . . but asked for and was granted a brief period to consult with [his] client, the plaintiff herein, to make sure that the client had no objection. He thereafter wrote to the [attorney trial referee] on November 8, 2010, confirming that his client, [the plaintiff], 'does not see there being any conflict of interest at all' and that 'he [Rod Abele as president of the plaintiff corporation] knowingly waives any right to challenge your continued service as the attorney trial referee in this matter.' This letter is on file. . . .

"After discussing the federal lawsuit and any possible conflict of interest, the [attorney trial referee] raised the issue 'as to when the clock starts running on my decision in this case.' He said, 'I am prepared to use the—filing date of the briefs [October 8, 2010] as the clock period, which is the normal presumptive period. . . .' Later in the dialogue, the [attorney trial referee] explained his policy that . . . 'I don't start doing any decision work until I have everything in because . . . the pieces aren't all there, and I could start off on the wrong track if I [don't have] everything in front of me. . . . I wait until I have everything before I start doing anything. . . . I thought I was going to be taking the file home today because I wasn't—again, not seeing anything in the nature of reply briefs.' . . . But, both counsel had advised the [attorney trial referee] that they had 'agreed to have reply briefs due a week late, and in the interim when reply briefs were due this

issue arose, and I believe we reached some sort of an understanding that we weren't going to file reply briefs until we had an opportunity to speak to you, so there may still be reply briefs due, which, I think, they—that would be the trigger date.' . . . Although he stated that he had been . . . 'up in the air [about the] status of the reply briefs,' the [attorney trial referee], after discussion with counsel, set a deadline of November 12, 2010, for the filing of reply briefs . . . with the understanding that if there was a problem with the November 12 date, the [attorney trial referee] would be receptive to approving an agreed extension. . . . After the briefing schedule for reply briefs had been set, the following dialogue occurred:

" '[The Defendants' Counsel]: I was just going to add that I know that [the plaintiff's attorney] and I had some discussions about whether or not Connecticut law applies versus New York law in certain instances. I think we're going to reserve and have that discussion amongst ourselves, and if we reach a resolution on that—so, I think it may make sense for the [attorney trial referee] not to waste [his] time at this point on struggling with that issue to the extent that it has to be struggled with.

" 'Attorney Trial Referee: Are you—well, are you referring to an issue that will be resolved prior to my rendering a decision?

" '[The Defendants' Counsel]: Yes, we'll either agree which law controls or will disagree, and you'll know that by the time the reply briefs—' . . .

"Thereafter, the deadline for submitting the reply briefs was extended by agreement of counsel due to scheduling conflicts involving medical issues in one attorney's family. This agreement is referenced in an e-mail of November 29, 2010, from [the plaintiff's attorney] to [the defendants' attorney] . . . . The court has not been advised on the agreed extended deadline for filing reply briefs, nor is that date mentioned in the e-mail. Nor has the court been advised whether or not the [attorney trial referee] was advised of the extended agreed deadline for reply briefs. But, in that same e-mail of November 29, 2010, [the plaintiff's attorney] stated: 'I will agree to [forgo] the reply briefs [if] you will also agree. My only caveat is that I think I may have submitted my posttrial brief without [attaching] the exhibit that contained the [New York] case law. May I resubmit the brief with the exhibit A attached.' [The defendants' attorney] responded by e-mail of November 30, 2011, asking [the plaintiff's attorney] to 'send me the case law/exhibit you want to submit.' [The plaintiff's attorney] responded on December 15, 2010: 'These are the out-of-state cases that I meant to attach to the posttrial brief for ease of reference. They are the exact same cases that were cited last February for the exact same arguments. . . . Will you object to me asking that they

be attached to my [posttrial] brief?' [The defendants' attorney] responded the same day, 'No objection. Please copy me on whatever you send to the [attorney trial referee].' The [attorney trial referee] was obviously made aware at some point that the parties had agreed to forgo reply briefs, as he stated in his report at page 1, 'and the parties subsequently waived reply briefs.' The court has not been advised when or how the [attorney trial referee] was made aware of that waiver. On December 30, 2010, the plaintiff filed another copy of his October 8 posttrial brief, but this time with attachments consisting of photocopies of three opinions of the New York Court of Appeals and four opinions of the New York Supreme Court . . . all cited and referred to in the body of the brief as originally filed under the arguments that the New York parol evidence rule should be applied to bar statements made by . . . MacIntyre regarding certain claimed oral agreements between the parties (Counsel agree that the written agreement between the parties contains a choice of law provision providing that New York law governs the written agreement between the parties.) The Judicial Branch form entitled 'Docket Legend Codes Attorney Trial Referee Program' . . . contains an entry, '12/30/2010 TRI COMP Trial Completed—Decision Reserved JD44 141.' The [attorney trial referee] report was filed on April 28, 2011, which was the 119th day after December 30, 2010." (Citations omitted.)

In its analysis, the court aptly observed that the dispositive issue was "whether or not the December 30, 2010 refiling of the plaintiff's October, 2010 trial brief with the seven copies of New York judicial decisions on the parol evidence rule, which copies had been inadvertently omitted when the brief was initially filed, marked the 'completion of the trial' for purposes of Practice Book § 19-4. Any earlier completion date would mean that the [attorney trial referee] report was filed too late." The court concluded that the completion date of the trial was December 30, 2010. It reasoned in relevant part: "As originally filed on October 8, 2010, the plaintiff's trial brief was incomplete. At the point in that brief where the parol evidence argument is made . . . and the seven New York cases are cited, the brief [states] in parenthesis: 'The New York cases are attached as exhibit A,' but they were not attached. The December 30 filing completed the October 8 filing. Parol evidence was a major issue in the case. The December 30 filing gave the [attorney trial referee] ready access, if he so desired, to a detailed review of the law of parol evidence in the jurisdiction stipulated in the choice of law provision of the parties' agreement. Getting those copies of those cases was part of the gathering of materials necessary to a well reasoned decision, as they were one of the elements directly or indirectly to be considered in rendering the decision." (Footnote omitted.) On the basis of this procedural background and

its interpretation of relevant legal authority, the court concluded that the report was properly filed in accordance with Practice Book § 19-4, and it rejected the defendants' objection on the basis of that rule of practice.

In appealing from the court's ruling, the defendants echo the arguments that they raised before the trial court. The defendants do not appear to dispute the procedural findings made by the court, that is, the court's recitation of the posttrial factual record. Instead, they assert that this record reflects that the trial completion date for purposes of Practice Book § 19-4 was October 8, 2010, the date on which the parties filed briefs following the hearing related to the parties' contractual dispute. The defendants assert that the hearing that took place on October 27, 2010, related to a possible conflict of interest involving the attorney trial referee, "was held by the [attorney trial referee] to address an issue unrelated to the issues raised at trial or briefed by the parties." Additionally, the defendants assert that the court did not request, nor did the parties file, reply briefs, and that the plaintiff, acting unilaterally, refiled its own October 8, 2010 brief on December 30, 2011, for the purpose of attaching copies of cases cited in its earlier trial brief. The defendants emphasize that this filing did not occur at the request of the attorney trial referee. The plaintiff asserts that the court properly considered the filing of the brief on December 30, 2011, where the brief and New York authority were necessary to the court's decision, to be the completion of the trial for purposes of Practice Book § 19-4.

Because the issue requires examination of the court's interpretation and application of Practice Book § 19-4, a task that is not discretionary, but legal in nature, we engage in plenary review. "The interpretive construction of the rules of practice . . . involves a question of law and our review . . . is plenary." (Citations omitted; internal quotation marks omitted.) *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 733–34, 830 A.2d 228 (2003).

Although Practice Book § 19-4 does not define the term "completion of the trial," we agree with the trial court that in light of the similarities in language and purpose shared by Practice Book § 19-4 and General Statutes § 51-183b, it is entirely reasonable to interpret that term in a manner consistent with prior judicial interpretations of the term "completion date of the trial," which appears in § 51-183b. "That portion of [§ 51-183b] has been the subject of interpretation and has been applied in several appellate decisions. In accordance with *Frank* v. *Streeter*, 192 Conn. 601, 604–605, 472 A.2d 1281 (1984), this court consistently has interpreted the statute such that '[t]he one hundred twenty day period begins to run from the date that the parties file posttrial briefs or other material that the court finds

necessary for a well reasoned decision.' *Cowles* v. *Cowles*, 71 Conn. App. 24, 26, 799 A.2d 1119 (2002); see also *Jordan* v. *Jordan*, 125 Conn. App. 207, 209 n.4, 6 A.3d 1206 (2010) (same), cert. denied, 300 Conn. 919, 14 A.3d 333 (2011); *O.J. Mann Electric Services, Inc.* v. *Village at Kensington Place Ltd. Partnership*, 99 Conn. App. 367, 374 n.5, 913 A.2d 1107 (2007) (same); *Bramwell* v. *Dept. of Correction*, 82 Conn. App. 483, 488, 844 A.2d 957 (2004) (same); *Northeast Savings, F.A.* v. *Scherban*, 47 Conn. App. 225, 231, 702 A.2d 659 (1997) (same), cert. denied, 244 Conn. 907, 714 A.2d 2 (1998)." *Bonito* v. *Bonito*, 140 Conn. App. 697, 702–703, 59 A.3d 882 (2013). In *Frank*, our Supreme Court held that the completion date of the trial, for purposes of § 51-183b, includes the filing of briefs, and it reasoned that "[w]hen litigation raises difficult questions of law, a trial court is well-advised to request briefs and to defer its written decision until such time as the court has had the opportunity to deliberate and to reach a thoughtful, reasoned conclusion." *Frank* v. *Streeter*, supra, 605.

In the present case, the parties' posthearing briefs were filed on October 8, 2010. Thereafter, the attorney trial referee held a hearing related to a potential conflict of interest, and set a deadline, November 12, 2010, for reply briefs to be filed. Sometime later, the parties agreed to forgo the filing of such briefs. By November 8, 2010, the plaintiff, through its president, Abele, communicated to the attorney trial referee that it would not challenge his continued participation in the case.

The record reflects, and the court found, that the plaintiff's brief of October 8, 2010, cited certain New York opinions as relevant and material legal authority related to the dispute submitted to the attorney trial referee. Although the plaintiff's brief stated that the New York opinions were attached as an exhibit to the brief, they were not so attached. By an e-mail exchange, the plaintiff's attorney notified the defendants' attorney of this deficiency in its filing and inquired about resubmitting the brief with the opinions at issue. The defendants' attorney, having been provided with the materials at issue, stated that there was "[n]o objection" to the proposed filing, which occurred on December 30, 2010.

Before the attorney trial referee, the parties consistently disputed whether Connecticut or New York law applied. The New York opinions that were included in the revised filing of December 30, 2010, were material to the issues that were raised before the attorney trial referee and were analyzed, consistent with New York law, in the plaintiff's posttrial brief. The choice of law issue was discussed during the hearing that took place on October 27, 2010, at which time the defendants' attorney stated before the attorney trial referee that the choice of law issue would be addressed by the parties. The defendants' attorney stated that the parties would

discuss the issue and advise the attorney trial referee accordingly so that the attorney trial referee would not have "to waste [his] time at this point on struggling with that issue . . . ." In reply, the attorney trial referee indicated that he would not start doing "any real decision work" until he "[had] everything" from the parties. The plaintiff's attorney indicated that the choice of law issue would be addressed by the parties "[o]ne way or another." The tenor of the conversation involving the attorneys and the attorney trial referee strongly indicates that the attorney trial referee would refrain from working on the case until he had received additional information from the parties concerning the choice of law issue. The attorney trial referee asked whether the parties would address the issue by way of reply briefs, to which the defendants' attorney stated, "Yes." Although the parties thereafter agreed not to file reply briefs concerning the choice of law issue, the plaintiff certainly had the right to do so. After the parties had determined not to submit reply briefs, the plaintiff submitted the brief with the opinions, related to the choice of law issue, which it had omitted from its previously filed trial brief.

By its own terms, the plaintiff's initial brief was incomplete without the opinions that were referred to as an exhibit but were not attached. Contrary to the defendants' suggestion, the record does not reflect that the plaintiff's attorney acted in a purely unilateral manner with regard to the filing of the brief on December 30, 2010. Although the attorney trial referee did not ask the plaintiff to submit a revised filing, it is clear from the statements of the attorney trial referee at the hearing on October 27, 2010, that the parties were welcome to submit briefs related to the choice of law issue. Additionally, the defendants' assertion is somewhat disingenuous, for the plaintiff's attorney notified the defendants' attorney of his desire to submit the revised brief, provided the defendants' attorney with its substance, and, absent objection, filed the brief only after the defendants' attorney indicated that the defendants did not object to it. The attorney trial referee did not in any manner reject the filing, which supports a determination that he considered it to be an appropriate part of the posttrial briefing process in this case. See *Ippolito* v. *Ippolito*, 28 Conn. App. 745, 750, 612 A.2d 131 (1992) (fact that state trial referee did not return or refuse to accept reply brief supports finding that referee considered it part of posttrial briefing process), cert. denied, 224 Conn. 905, 615 A.2d 1047 (1992). On this record, we consider the submission of the plaintiff's brief on December 30, 2010, with the opinions attached, to be the perfected submission of its posttrial brief. Accordingly, we agree with the court that the subsequent filing of the report of the attorney trial referee on April 28, 2011, did not run afoul of Practice Book § 19-4.

II

Next, on three grounds, the defendants claim that the court accepted the report in error because the agreements on which the attorney trial referee based his report were not enforceable. We disagree, and will address each ground raised in support of this claim in turn.

Among his findings, the attorney trial referee found that, through MacIntyre, Sono, which was in the business of selling stone and gravel, applied for and was granted a line of credit from the plaintiff, which was in the business of selling, leasing, and repairing heavy equipment. MacIntyre signed the credit application on behalf of Sono and signed a personal guarantee with respect to the credit line. Additionally, Sono, through MacIntyre, "authorized other Sono employees to sign documents upon delivery of equipment to Sono—their authority was limited to committing Sono to the essential terms of the contract documents but not any fine print details not previously agreed to by MacIntyre." The attorney trial referee found that, thereafter, the parties entered into several contracts concerning various items (wheel loaders, excavators), parts, and services provided to the defendants by the plaintiff. The plaintiff sent Sono invoices for moneys due under these contracts, but Sono failed to make payment.

The court rejected the defendants' challenges to the report of the attorney trial referee. "The standard of review in cases referred to attorney trial referees is well settled. [B]ecause the attorney trial referee does not have the powers of a court and is simply a fact finder, [a]ny legal [determinations] reached by an attorney trial referee have no conclusive effect. . . . The reviewing court is the effective arbiter of the law and the legal opinions of [an attorney trial referee], like those of the parties, though they may be helpful, carry no weight not justified by their soundness as viewed by the court that renders judgment. . . . [When] legal [determinations] are challenged, [the reviewing court] must determine whether they are legally and logically correct and whether they find support in the facts found by the . . . referee. . . .

"The trial court's findings of fact were based entirely on the record of the proceedings before the attorney trial referee. Under these circumstances, application of the clearly erroneous test must reflect the special rules that govern judicial review of a report of an attorney referee. While the reports of [attorney trial referees] in such cases are essentially of an advisory nature, it has not been the practice to disturb their findings when they are properly based upon evidence, in the absence of errors of law, and the parties have no right to demand that the court shall redetermine the fact thus found. . . . A reviewing authority may not substitute its findings for those of the trier of the facts. This principle applies no matter whether the reviewing authority is

the Supreme Court . . . the Appellate Court . . . or the Superior Court reviewing the findings of . . . attorney trial referees. . . . This court has articulated that attorney trial referees and factfinders share the same function . . . whose determination of the facts is reviewable in accordance with well established procedures prior to the rendition of judgment by the court. . . . [T]he trial court may not retry the case and pass on the credibility of the witnesses . . . ." (Citation omitted; internal quotation marks omitted.) *Generation Partners, L.P.* v. *Mandell*, 148 Conn. App. 294, 299–300, 85 A.3d 49 (2014).

A

First, as they did before the trial court, the defendants claim that the attorney trial referee erroneously relied on the credit account agreement because portions of it are unreadable or are illegible and, consequently, "essential," and "material terms of the agreement are effectively missing or unintelligible." The defendants argue that because portions of the agreement "were effectively missing," there was no meeting of the minds and an enforceable contract does not exist.

The court observed that the defendants' claim was abstract in that they did not claim that any particular provisions of the agreement were illegible and, thus, reflected that a meeting of the minds did not occur. The court stated: "The copy of the credit account agreement/guarantee marked in evidence as plaintiff's exhibit 2 is no doubt difficult to read because it is blurry. . . . [T]his same argument of illegibility and unenforceability was made to the [attorney trial referee], who made no finding of illegibility or of any particular wording that was integral to the agreement being misunderstood because of the printing and said: 'Defendant MacIntyre claims that the illegibility of the document he signed makes it . . . unenforceable. [*Edart Truck Rental Corp.* v. *B. Swirsky & Co.*, 23 Conn. App. 137, 140, 579 A.2d 133 (1990)] is instructive here—[MacIntyre] knew that he was signing a legal document, and if he [had] been at all concerned about the details of his personal commitment (guarantee) he could easily have asked for a more legible copy. . . . "[MacIntyre] knew of its existence and location, and did not attempt to read it or discover its contents by another means."

"The principle of law relied on by the [attorney trial referee] is legally correct. His conclusion to enforce the agreement is consistent with his finding . . . that . . . MacIntyre signed a personal guarantee in addition to signing the credit application on behalf of Sono, and with his failure to find that the agreement was illegible or that the blurry printing caused a misunderstanding as to any integral part of the agreement. It is not within the authority of this court to make additional findings of fact absent a stipulation of the parties or other indication that the fact is uncontested. There is nothing of

that nature before me. Without such findings, however, the [attorney trial referee's] conclusion of enforceability must stand."

The record of proceedings before the attorney trial referee reflects that there was no factual dispute that MacIntyre signed the credit account agreement, which included his personal guarantee. When he was presented with the agreement during his examination before the attorney trial referee, he identified it and testified that, although he had trouble reading the document, he nonetheless signed it and returned it to the plaintiff.

On the record before us, we do not conclude, with regard to the facts or the law, that the attorney trial referee erroneously determined that the parties had entered into a binding, enforceable contract. Although MacIntyre testified that he conveyed to Warren Abele, the corporate secretary of the plaintiff corporation, that he had trouble reading the document, he stated that Warren Abele reassured him that he was "in good hands" and that it was a credit application. The attorney trial referee did not make a finding that a meeting of the minds did not occur due to any issues of illegibility related to the agreement. "The general rule is that where a person [who is] of mature years and who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is [that person's] duty to read it and notice of its contents will be imputed to [that person] if [that person] negligently fails to do so. . . . This rule is qualified by the intervention of fraud, artifice or mistake not due to negligence." (Citation omitted; internal quotation marks omitted.) *Phoenix Leasing, Inc.* v. *Kosinski*, 47 Conn. App. 650, 654, 707 A.2d 314 (1998). The rule applies "only if nothing has been said or done to mislead the person sought to be charged or to put a [person] of reasonable business prudence off . . . guard in the matter." *Ursini* v. *Goldman*, 118 Conn. 554, 562, 173 A. 789 (1934). The undisputed evidence was that the agreement and guarantee provisions were presented to MacIntyre, an established business person. There was no evidence of coercion, fraud, or mistake. There was no evidence that the plaintiff, through its agents, misled MacIntyre with regard to the agreement at issue. "[T]he defendant had a duty to read the [agreement and guaranty] and cannot now plead his self-induced ignorance of its contents." *Phoenix Leasing, Inc.* v. *Kosinski*, supra, 654–55.

B

Next, as they did before the trial court, the defendants argue that the four rental agreements on which the plaintiff relied were not enforceable contracts because they consisted of two separate documents, namely, rental lease agreements and delivery tickets, which were "devoid of any cross-referencing or incorporation of the respective separate paragraph provisions on the

reverse/rear page(s) [of the forms] by reference." We disagree.

In rejecting this argument, the court stated: "[The defendants argue] that the evidentiary documentation supporting each equipment rental transaction between the parties failed to demonstrate a meeting of the minds between the parties because the two form agreements or documents used by [the plaintiff] for equipment rentals, the rental lease agreement, and the delivery ticket, are devoid of any cross-referencing or incorporation by reference. [In their objections to the report, the defendants argue:] As a result, the court should not accept the finding in the report that said agreements are enforceable, and enter judgment in favor of the defendants. . . . This argument was made to the [attorney trial referee] who, nonetheless, found that the defendants had enter[ed] into the rental contracts and were responsible for unpaid balances on the four rental transactions claimed by the plaintiff, thereby concluding that the rental transactions were effectuated pursuant to enforceable agreements.

"The integration issue came up in the context of [the] defendants' attempt to introduce parol evidence that some of the so-called rentals were actually free loaners. The plaintiff opposed that offer of testimony on the ground of the parol evidence rule and the integration clause of the rental agreements. The plaintiff's position is stated in its reply to [the] defendants' objection to [the attorney trial referee] report [in which it stated that] [t]he president of [the plaintiff], [Rod] Abele, testified that when a customer rents a piece of equipment, a standard rental agreement is printed out, which is comprised of two, double sided, carbon copy pages. The front of the first page, entitled rental lease agreement, sets forth the specific terms of this lease agreement, including [the] customer's name, the date of the agreement, [a] description of the equipment, and the price. . . . The bottom of the first page states that this rental is subject to the Standard Rental Terms attached hereto and incorporated herein. DO NOT SIGN THIS AGREEMENT BEFORE YOU READ ALL OF IT . . . . On the reverse side of the first page of the rental agreement there are standard rental terms in number[ed] paragraphs 1 through 13. The front side of the second page of the rental agreement states at the top, delivery ticket, and also identifies the customer, the equipment leased, and in a column on the left hand side of the page describes the condition of the equipment going out; on the right hand side is a column headed condition of the equipment coming in. . . . On the reverse side of the second page of the rental agreement the standard rental terms continue where the back of the first page left off, in number[ed] paragraphs 13 through 23. Of particular interest is paragraph 23, captioned MERGER AND ORAL REPRESENTATIONS . . . which provides: *This agreement is the entire*

*agreement of the parties hereto. There are no prior oral or written . . . [representations] . . . promises or warranties except as set forth herein. Any modification to this agreement by the customer are ineffective specifically except in writing by an authorized representative of the Lessor. . . .* At trial, the defendants tried to claim that the documents were not part of a single agreement so as to avoid the consequences of the MERGER AND ORAL REPRESENTATIONS clause.

"The [attorney trial referee] held that [Sono's] equipment operators who signed the rental agreements and the delivery tickets for each piece of equipment as it was delivered could not be reasonably believed by [the] plaintiff to consent to an integration clause or otherwise waive [Sono's] right to challenge any variance between an agreement *actually* reached between the parties and the documentation being signed. But the [attorney trial referee] found it unnecessary to rule on the issues of integrated contracts or the parol evidence rule: Ultimately, the issues relating to integrated contracts and the parol evidence rule need not be resolved. There was no credible evidence (if any at all) that the claimed loaners explicitly were represented as being provided at no cost, and there was no credible evidence (if any at all) that . . . MacIntyre ever sought a definitive resolution such that his precise position was known to [the] plaintiff, e.g., confronting Warren Abele about the existence of any charges for equipment that was being provided at no cost. . . .

"The integration issue and any lack of a meeting of the minds on the applicability of the merger and oral representations clause to both the rental agreement and the delivery ticket therefore became irrelevant, and this claim of error cannot afford any relief to the defendants. The [attorney trial referee's] handling of the issue, being based on a lack of evidence before him, is not clearly erroneous. The defendants have not cited to the court any evidence that the claimed loaner equipment was represented as being provided at no cost.

"As an additional ground of overruling the lack of integration argument, the court will offer [its] legal conclusion based solely on a review of the rental agreement/delivery ticket exhibits that the two documents are one integrated contract. Their separateness is largely a function of [the] plaintiff's counsel's tactical decision to offer them in evidence under separate exhibit numbers, but that does not determine substantive issues and fails to reflect the reality of the documentation. The rental agreement and the delivery ticket, although they do not explicitly cross-reference each other, both expressly list the names of both parties, the identical contract number, the date of the rental, a description of the rented equipment, including its serial number and the identity of the customer representative who ordered the equipment. Furthermore, the standard

rental terms, incorporated by reference at the bottom of the rental agreement, consist of numbered paragraphs printed on the reverse side. Paragraphs 1 through 13 appear on the rental agreement; paragraphs 14 through 23 plus the guarantee clause appear on the delivery ticket, further confirming that the two documents are each part of one continuous transaction and constitute but one agreement." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.)

On appeal, the defendants assert that the rental agreements on which the attorney trial referee relied were not enforceable because each such agreement consisted of two separate documents, namely, rental lease agreements and delivery tickets, which did not incorporate one another by reference. This argument is not persuasive. As a preliminary matter, the attorney trial referee correctly observed that this issue was unavailing to the defendants, as there was no credible evidence that the rental agreements at issue were not binding on the defendants because, extrinsic to any agreement, the plaintiff had agreed to loan equipment to the defendants at no cost. Furthermore, we agree with the court that there is no basis on which to conclude that, with regard to the four rental agreements at issue, the two documents that comprised the agreements at issue and for which the plaintiff sought damages, namely, the rental agreements and the delivery tickets, were not, in each instance, separate components of one continuous transaction that resulted in a contract. The evidence demonstrated that the plaintiff used these two documents when entering into rental agreements with Sono. The fact that the two documents do not cross-reference each other or that the front of the documents does not explicitly refer to the twenty-three provisions that appear on the back side of both documents is of no consequence because, with regard to each of the rental contracts at issue, the evidence does not demonstrate that these writings were not components assented to during one continuous transaction between the parties. "Where writings relating to the same subject matter are assented to as parts of one transaction, both form part of the integrated agreement." (Internal quotation marks omitted.) *Nash* v. *Stevens*, 144 Conn. App. 1, 36, 71 A.3d 635, cert. denied, 310 Conn. 915, 76 A.3d 628 (2013).

C

Finally, as they did before the trial court, the defendants claim that the evidence does not demonstrate that the Sono employees who signed the rental lease agreements and the delivery tickets had the authority to bind Sono contractually under a theory of apparent authority. We disagree with the defendants' claim.

As stated earlier in this opinion, the attorney trial referee found that "Sono, through MacIntyre, author-

ized other Sono employees to sign documents upon delivery of equipment to Sono—their authority was limited to committing Sono to the essential terms of the contract documents but not any fine print details not previously agreed to by MacIntyre." The attorney trial referee further observed, and the evidence reflects, that employees of Sono signed "contract documents," namely, rental lease agreements and delivery tickets, in connection with the delivery of equipment by the plaintiff, from upstate New York, to Sono, at Sono's place of business in Norwalk. The payment for these deliveries is at issue in this dispute between the parties.

From the uncontroverted evidence that these rental deliveries occurred after orders were placed by Sono, the attorney trial referee inferred that they had been "actually negotiated/arranged prior to delivery . . . . [W]hile fine print details may not have been the subject of any agreement, it seems a reasonable inference that the plaintiff would not send a truck, in turn carrying a backloader or other heavy piece of equipment, from the Albany area of New York to Norwalk, without some prior understanding, if not firm agreement, as to the nature of the transaction (sale, lease/rental, free loaner, etc.)." Further, the attorney trial referee found: "[The] defendant was experienced in purchase and rental of this type of heavy equipment and so must have known that there were likely to be some conditions associated with the delivery of any such equipment—barring the expectation that the delivery was intended as a gift." The attorney trial referee, however, found that there was no credible evidence that the plaintiff had made deliveries at no cost to Sono.

The attorney trial referee, however, rejected the plaintiff's argument that the employees of Sono who signed the contractual documents at issue upon the delivery of the equipment bound Sono to fine print provisions therein, including a provision that the parties' agreement was integrated. The attorney trial referee stated: "Whatever authority [the] plaintiff might reasonably expect a worker to have with respect to signing paperwork upon delivery, it does not appear to be reasonable to 'assume' that someone like an equipment operator had authority to negotiate previously unknown or legal technicalities in the fine print terms of the agreement before signing and/or authority [to] waive any objections to such terms. Neither an office worker nor equipment operator could have been reasonably believed by [the] plaintiff to have authority to consent to an integration clause or otherwise waive [the right of Sono] to challenge any variance between an agreement *actually* reached between the parties and the documentation being signed." (Emphasis in original.)

The court concluded that the attorney trial referee reasonably found that the employees' signatures on the

rental agreement documents bound Sono with regard to the basic contract provisions, including the obligation to pay, which would have been agreed to prior to the time of delivery. The court relied on case law that stands for the proposition "that signatures of employees on contract type documents are binding on an employer under the doctrine of apparent authority." The court agreed with the attorney trial referee's analysis, including his findings that MacIntyre had agreed to the basic contract provision concerning cost, the contract documents at issue included a description of cost, and that MacIntyre was experienced in business such that he should expect that the delivery of heavy equipment would require the signature of a Sono employee. "The court finds that to be a reasonable inference, especially since all four of the rental agreements . . . list [Sono's] sole member . . . MacIntyre . . . as the customer representative who had placed the order for the rental equipment. The [attorney trial referee's] legal analysis is correct and his inference of apparent authority finds support in the evidence and is not clearly erroneous." (Citation omitted.)

In the present case, the evidence was uncontroverted that Sono, through, MacIntyre, ordered the equipment at issue. The attorney trial referee reasonably found that the equipment at issue was delivered at the behest of MacIntyre after he had reached an agreement as to the basic details concerning the cost to be incurred by Sono. From the evidence before him, including MacIntyre's testimony, the attorney trial referee reasonably found that MacIntyre knew or should have known that Sono employees would be expected to sign the contract documents upon completed delivery of the equipment at issue and that they did so. The evidence did not yield a finding that Sono's employees had acted outside of their prescribed duties for Sono, but that they had acted predictably in signing the contract materials. The evidence, including MacIntyre's testimony, supported a finding that Sono's employees were authorized to act in the manner that they did in terms of signing the contractual materials at issue at the time of delivery, thus binding Sono to the basic contractual terms therein.

"[I]t is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal . . . . Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf. . . . It is well settled that [t]he nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn [therefrom]." (Citations omitted; internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC,*

125 Conn. App. 678, 692, 10 A.3d 61 (2010), cert. denied, 300 Conn. 914, 13 A.3d 1100 (2011).

Although the trial court couched its analysis in terms of apparent authority, the attorney trial referee found that the parties orally had agreed to the essential terms underlying the rental agreements prior to the time of delivery and that, at least as it concerned the terms that were agreed upon at the time that MacIntyre ordered the equipment at issue, that such agreements became binding on Sono when employees who were actually authorized by Sono to sign the relevant contract documents did so at the time of delivery. Despite the court's fleeting reference to apparent authority, the attorney trial referee found that the Sono employees at issue were authorized to act in the manner that they did. Thus, the defendants' attempt to undermine the attorney trial referee's decision, by asserting that apparent authority was lacking, is not persuasive.

Further undermining the defendants' arguments is the fact that the attorney trial referee reasonably found that the defendants' arguments were unpersuasive in light of the fact that there was no credible evidence that the contracts at issue were for equipment that was being provided at no cost to Sono. Also, the attorney trial referee found that MacIntyre attempted to distance himself from these signed rental documents when they made their way to him. The attorney trial referee stated: "Also troubling is . . . MacIntyre's general disregard for documents signed by his employees and even the documents he signed. The testimony was that he did not attempt to read the paperwork signed by his employees, and he seemed to adopt an 'it was blurry and hard to read' approach to the details of the document he initially signed, as if that somehow negated his consent to the terms of a document he actually signed." Accordingly, on the record before us, there is no basis to upset the findings of the attorney trial referee that the rental agreements signed by Sono employees were enforceable.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Also, the defendants appeal from the judgment of the trial court denying their motion to reargue and, or, to reconsider its decision to accept the report. They do not, however, raise any claims related thereto.

[2] The attorney trial referee noted that the parties had agreed that any determination of the amount of attorney's fees should be deferred to a subsequent hearing.

[3] After the defendants filed the appeal, the court calculated the amount of interest due the plaintiff as well as the amount of attorney's fees awarded the plaintiff. The fact that the trial court had not yet calculated the amount of interest due the plaintiff at the time that the appeal was filed does not affect the finality of the court's judgment because, at that time, the court had set the rate of interest and the date from which interest should be calculated. See, e.g., *Tomasso Bros.*, *Inc.* v. *October Twenty-Four*, *Inc.*, 230 Conn. 641, 650 n.9, 646 A.2d 133 (1994) (contempt order final despite fact that court had yet to complete ministerial act of calculating amount of fine at time appeal filed). Additionally, the parties do not raise any claims in the appeal concerning the court's interest award. Likewise, the fact that the

trial court had not yet determined the amount of the attorney's fees awarded to the plaintiff at the time that the defendants filed the appeal does not affect the finality of the court's judgment because the parties do not appeal from the attorney's fees award. Compare *Benvenuto* v. *Mahajan*, 245 Conn. 495, 715 A.2d 743 (1998) (judgment on merits final despite lack of ruling on attorney's fees) with *Stuart* v. *Stuart*, 112 Conn. App. 160, 188–89, 962 A.2d 842 (2009) (appeal from attorney's fees award not final where court had not determined amount of fees at time appeal filed), rev'd in part on other grounds, 297 Conn. 26, 996 A.2d 259 (2010); *Burns* v. *General Motors Corp.*, 80 Conn. App. 146, 150 n.6, 833 A.2d 934 (2003).

[4] We note that minor changes not relevant to this appeal were made to Practice Book § 19-4 by a 2011 amendment that became effective subsequent to the filing of the attorney trial referee's report in this case. Because the relevant language remains unchanged, for convenience we refer to the current revision of Practice Book § 19-4.

———————————————